**HOTEL COAMO SPRINGS, INC., Plaintiff,**

**v.**

**Rafael Hernandez COLON, Governor of the Commonwealth of Puerto Rico; Francisco De Jesus Schuck, Secretary of Justice, Commonwealth of Puerto Rico; Rafael Alonso Alonso, President, Commonwealth Planning Board; Pedro Mora; Francis Conway; Luis Negron Zayas, Members, Commonwealth Planning Board; Salvador Casellas, Secretary of the Treasury, Commonwealth of Puerto Rico; Emilio Casellas, Administrator, Public Recreation and Parks Administration; Roberto Bouret, Director, Tourism Development Company, Defendants.**

**Civ. No. 74–0598.**

United States District Court, D. Puerto Rico.

May 12, 1982.

William H. Preston, Jr., Francis, Doval, Muñoz, Acevedo, Otero & Trias, San Juan, P. R., for plaintiff.

Héctor Reichard-de-Cardona, Secretary of Justice, Com. of P. R., Dept. of Justice, San Juan, P. R., for defendants.

## MEMORANDUM OPINION AND ORDER

CEREZO, District Judge.

By Joint Resolution 48[1] approved on May 31, 1973 the Legislature of the Common-

---

1. Its complete text is the following:

(J.R. of H. R. 132)     48     31 May 1973
(Conference)

### JOINT RESOLUTION

To declare a public utility twenty-five (25) "cuerdas" of land in which exist the buildings and structures and the thermal waters known as Coamo Springs ("Los Baños de Coamo"); to declare that it is the public policy the establishment of a recreational and vacationing center in Coamo Springs ("Baños de Coamo"); to establish the procedures necessary for the acquisition and possession or domain of said buildings and lands; and for the preparation of a plan for the use according to the purposes of this resolution.

Be it resolved by the Legislative Assembly of Puerto Rico:

Section 1.—It is declared to be the public policy of the Commonwealth of Puerto Rico to utilize Coamo Springs ("Los Baños de Coamo") as a center for recreation and vacationing for the enjoyment of the people of Puerto Rico.

wealth of Puerto Rico declared (1) that 25 cuerdas in which thermal waters known as the Coamo Springs as well as the buildings and structures found therein were a public utility; (2) that it was the public policy of the Commonwealth to utilize the Coamo Springs as a recreational and vacationing center for the enjoyment of the People of Puerto Rico; and, (3) announced that the necessary provisions would be established for the acquisition and possession or domain of said buildings and land. Subsequent to this legislative declaration of public utility and condemnation authorization, judicial condemnation proceedings were filed in the Superior Court of Puerto Rico, Eminent Domain Part, Civil E–75–826, on August 8, 1975 by the Commonwealth of Puerto Rico represented by the Executive Director of the Land Administration of Puerto Rico for the acquisition of 24.4142 cuerdas and the structures located therein situated in the municipality of Coamo, Puerto Rico, belonging to Hotel Coamo Springs, Inc., plaintiff herein. These proceedings were brought pursuant to the General Law of Eminent Domain of March 12, 1903, as amended, 32 LPRA Sec. 2901 *et seq.* It was alleged in the condemnation complaint that the acquisition of those properties was a public necessity; that the interest which the Commonwealth proposed to acquire was that of absolute ownership; that said acquisition had been approved by the Planning Board as well as by the Governing Board of the

Land Administration of Puerto Rico by Resolution 350 of June 7, 1974 and that the compensation deemed to be just was the sum of $195,310 which was deposited in the Clerk's Office upon filing the petition to be distributed among the persons or entities with a right thereto. The description of the property was made in a separate document attached as an exhibit to the condemnation petition. The properties there described are two parcels of land having an area of 12.-7264 and 11.6878 cuerdas, respectively, located in Barrio San Ildefonso in the municipal jurisdiction of Coamo. The boundaries of each of these parcels of land were specifically outlined and the details of their inscription in the Registry of the Property set forth. Hotel Coamo Springs, Inc. answered the condemnation complaint accepting its allegations except for the one relative to the valuation of the property. As to this it alleged that the condemned lands include springs of sulfurous and thermal waters whose value exceeds $20,000,000; that the condemned lands are part of properties within which the government had approved a tourism development project in which substantial investment had been made which require compensation in excess of $30,000,000; that the condemned lands form part of a larger property which will sustain severance damages exceeding $30,-000,000 and that the filing of the condemnation complaint was the result of an in-

Consequently, they are declared as public utility the buildings and thermal springs known as Coamo Springs ("Los Baños de Coamo") and twenty-five (25) "cuerdas" of land, that include the sites wherein said buildings are located. It is declared also that it is necessary to acquire the possession or domain of said buildings and lands for the purposes of this Resolution.

*Section 2.*—The Secretary of the Treasury, in consultation with the Director of Tourism and the Administrator of Parks and Public Recreation, shall make the appraisal of the buildings and shall select and appraise the lands, with the purpose of acquiring said buildings and lands through eminent domain or for the purpose of acquiring their possession by lease for a minimum term of twenty-five (25) years.

*Section 3.*—In consultation with the Administrator of Parks and Public Recreation, the Director of Tourism will design a plan present-

ing the basis for the use of Coamo Springs ("Los Baños de Coamo") and the adjoining lands for the establishment of a recreational and vacationing center for the enjoyment of the people of Puerto Rico.

*Section 4.*—Within sixty (60) days of the approval of this resolution the Secretary of the Treasury will render to the Legislative Assembly of Puerto Rico and to the Governor of Puerto Rico a report containing his efforts, according to what it is established in section 2 of this resolution, and containing his recommendations and his requests for funds. Within said term the Director of Tourism will submit to the Legislative Assembly and to the Governor of Puerto Rico the plan referred to in section 3 of this resolution. Both public officials may submit jointly their respective reports.

*Section 5.*—This resolution will have immediate effect after its approval.

verse condemnation action pending in this Court. Accordingly, Hotel Coamo Springs, Inc. requested compensation in these amounts.

Before the commencement of these condemnation proceedings and eleven months after Joint Resolution 48 was approved, Hotel Coamo Springs, Inc. filed the present Section 1983 action asserting that the resolution had the same effect as a general statute and seeking a declaration of unconstitutionality on the grounds that it constitutes:

a) A taking of private property for public use without due process of law since it purports "to establish a procedure whereby the Commonwealth intends to acquire title over plaintiff's land"[2] and contains no provision for notice or hearing to present evidence on the value of the property or on the amount of plaintiff's investment;

b) A denial of the equal protection of the laws since it establishes a procedure to condemn plaintiff's property in a manner different from others similarly situated and denies it the rights guaranteed by the General Condemnation Law of Puerto Rico, 32 LPRA Sec. 2901 *et seq.*;

c) An unconstitutional taking since it declares plaintiff's land to be a public utility without providing for compensation;[3]

d) A denial of due process for it does not describe specifically which part of plaintiff's land constitutes the 25 cuerdas;

e) A violation of plaintiff's vested rights since approval had been granted by the Planning Board of the Commonwealth for partial development of Coamo Springs and such authorization led to an investment of over $3,000,000 in the land;

f) A violation of Article 1, Section 10 of the Constitution of the United States.

In addition to seeking a declaration of unconstitutionality, plaintiff requested damages in the sum of $5,000,000.

The matter was submitted to the Court for decision upon the filing of a stipulation of facts, documentary evidence and memoranda. In order to properly understand plaintiff's claim, it is necessary to summarize the development of its theory as set forth in the multiple memoranda of law presented. In its memorandum of July 23, 1974 plaintiff presents a situation of "freezing" or paralyzation of its property without just compensation as a result of the approval of Joint Resolution 48 in justification of its 1983 claim and points out "that a long standing threat to condemn can constitute a taking of property without just compensation and without due process of law." It further states that "all of the facts alleged in the complaint taken as a whole necessarily establish the *intent* of the Commonwealth to condemn said land for public use."[4] (Underlying ours.) The August 28, 1975 memorandum filed by plaintiff once again relies on the theory that its property has been frozen for an unreasonable amount of time and on the contentions that the resolution is a long standing threat of condemnation since it is clear from its text that the government intends to condemn the land and that assuming the resolution constitutes an enactment in the nature of a zoning, ordinance or regulation it is invalid for it does not provide for compensation. It also argues that such a regulation amounts to a permanent deprivation since the resolution does not contain a time limitation within which to condemn the property, that such a restriction imposes upon it the burden of assuming the costs of the benefit to the general welfare without compensation, that land frozen for an unreasonable period of time by means of classification as a public use district constitutes a taking and that frozen land must be acquired within a reasonable period of time. Plaintiff urges at page 22 of its memorandum that the facts stipulated demonstrate that Joint Resolution 48 closely resembles a "P" zoning, al-

---

**2.** Allegation 21(a), page 8 of the complaint.

**3.** In this allegation 21(c) of the complaint it is also said that Joint Resolution had been in effect for over eleven months and, despite

plaintiff's efforts, no action had been taken to acquire the land for the Commonwealth.

**4.** Page 2 of the memorandum filed July 23, 1974.

though more harmful than ordinary "P" zoning cases since the freezing was accomplished by the Legislative Assembly as a whole whose members have absolute immunity and since it cannot resort to administrative action to defreeze the property. It concludes at page 24 of its brief that the legislature's motive in enacting Joint Resolution 48 was to keep the cost of the land to be acquired by the state in future condemnation proceedings from increasing. It points out procedural due process deficiencies such as lack of notice and hearing and claims that Joint Resolution 48 results in acquisition of the land "without resorting immediately to eminent domain proceedings or normal purchase agreements." [5]

On July 12, 1976 the Court entered an Opinion and Order containing findings of fact based on the stipulated facts, the documentary evidence and the pleadings. These findings reveal that plaintiff is the owner of the 227 cuerdas on which the 25 cuerdas declared to be public utility by the Legislature by Joint Resolution 48 are located and that within that land there are thermal springs which are unique in Puerto Rico in that they offer the only known therapeutic hot springs in the Island. The pleadings as well as the stipulations of facts which form the basis of the Court's findings further reveal that in contemplation of the development of a tourism complex plaintiff presented plans to the Planning Board for approval, that some of these plans were approved, construction permits issued for the construction of the foundations of the main building of the Hotel, the golf course, and other facilities, that plaintiff had obtained a binding financial commitment and had made a total investment in the project in excess of $3,000,000, that on May 31, 1973 Joint Resolution 48 was approved by the Legislature of Puerto Rico and that a subsequent request to the Planning Board to construct 200 villas on plaintiff's property was denied because Joint Resolution 48 had declared plaintiff's property a public

utility, that plaintiff's partially terminated project was based upon the use and development of the unique thermal springs known as Coamo Springs, that it was faced with foreclosure proceedings and that the Commonwealth of Puerto Rico had commenced condemnation proceedings in case E–75–826 for condemnation of 24.4142 cuerdas equivalent to the 25 cuerdas mentioned in Joint Resolution 48 and had consigned the sum of $195,310 as just compensation for their acquisition. The thrust of the Court's Opinion and Order is directed to the constitutional attack made by plaintiff on Joint Resolution 48.[6] It concluded at page 16 of its Opinion that neither notice nor an opportunity for a hearing were afforded plaintiff when the Legislature of Puerto Rico made a declaration of public utility concerning the 25 cuerdas owned by it. It stated that it was after plaintiff had incurred a substantial expense to develop its project, relying on prior governmental approval, that Joint Resolution 48 was enacted freezing 25 cuerdas of plaintiff's land upon which the thermal springs were located and that plaintiff had a vested right to pursue its project. Observing that it was unclear under what distinct aspect of the police power the legislature acted in declaring plaintiff's land to be a public utility, it found that a state's power to restrict the use of land will be recognized as a taking if the regulation goes too far and that the legislature's noble purpose in enacting Joint Resolution 48 in an attempt to guarantee the use of the thermal springs for the general public must give way to plaintiff's property rights since the regulation caused a substantial loss without just compensation.[7] Although at the time the Court entered its decision on July 12, 1976 eminent domain proceedings had already been initiated in the Superior Court of Puerto Rico since the year 1975, a fact of which the Court was aware and to which it makes express reference in finding of fact 18, it

---

5. Page 28 of the August 25, 1975 memorandum.

6. The Court dismissed as lacking in merits defendants' contentions that a complaint failed to

state a cause of action against them and lack of jurisdiction on grounds of sovereign immunity.

7. Page 19 of the Opinion and Order.

cited Justice Holmes expressions in the sense that "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change" and further stated that when the limitation "reaches a certain magnitude, in most, if not in all cases, there must be an exercise of eminent domain and compensation to sustain the act." It agreed with plaintiff that Joint Resolution 48 had a freezing effect over its land in a manner similar, if not identical, to a "P" zoning generally applied in Puerto Rico and that such freezing could not continue for an unreasonable period of time. Although aware that condemnation proceedings had already been filed by the Commonwealth, the Court segregated this important fact and concentrated on the isolated issue of whether or not Joint Resolution 48 provided for just compensation for the taking of plaintiff's property and its alleged vested right to develop the project.[8] Again, although cognizant that the recovery of damages *in a condemnation proceeding* is not limited to actual invasions of the land itself and that damages may be recovered in those proceedings by evidence of a direct visible disturbance of existing rights which an owner possesses in connection with its property which give it additional value and by evidence that the owner has sustained special damages with respect to its property and although observing that damages may be recovered in an eminent domain proceeding for property not actually taken, the Court nonetheless, disregarded the remedy available to plaintiff to present such evidence in the condemnation proceeding itself and concentrated once more on Joint Resolution 48 stating that it merely provided for compensation for the value of the land and the buildings and not for plaintiff's other property rights incidental to ownership. It then concluded that Joint Resolution 48 is unconstitutional in that it constitutes a taking of plaintiff's property without just compensation.

A motion for reconsideration was filed on July 20, 1976 by defendants in which they state that the attorney formerly in charge of their defense failed to inform the Court that ordinary eminent domain proceedings had been instituted in the Superior Court of Puerto Rico in case E–75–826 and that Hotel Coamo Springs, Inc. stated in its answer to the condemnation complaint that it accepted all allegations contained therein except for the valuation of the property taken and requested compensation for the value of the thermal springs, damages for interruption of its tourism development project plus severance damages. They also indicated that on June 14, 1976 most of the funds consigned by the government had been withdrawn. They urged the Court that, given such a situation, this case was a proper one for abstention. In an early opposition to the motion for reconsideration plaintiff states that defendants were negligent in not bringing before the Court the evidence of the condemnation proceedings while in a later motion to stay it admits that the Court knew of these proceedings and made findings of fact to that effect. In any event, this issue is totally irrelevant. What matters is not whether defendants or their attorney properly informed the Court of the existing condemnation proceedings but rather that such proceedings did in fact exist since the year 1975 and that the Court knew of them when it issued its Opinion and Order in 1976.

On August 18, 1976 the Court issued a Certification stating that defendants had filed a timely motion for reconsideration, that permission had been granted by our Circuit to appeal under 28 U.S.C. Section 1292, that new evidence had been tendered as grounds for defendants' motion for reconsideration which was not before it at the time of its original ruling and which would require reevaluation of the case. The Court expressed its willingness to reconsider in light of the new evidence tendered pursuant to Rule 60 of the Federal Rules of Civil Procedure should the case be returned for its consideration. On August 18, 1976, the

---

**8.** Page 23 of the Opinion and Order.

Court of Appeals entered an order granting the district court leave to reconsider its Order of July 12, 1976 and directing the Clerk to advise it promptly of the district court's decision on the matter. It should be noted that the evidence tendered by defendants in support of their motion for reconsideration was none other than copies of the condemnation proceeding pending before the Superior Court of Puerto Rico.

■ Both parties filed memoranda in support and in opposition of the Motion for Reconsideration. Plaintiff filed a Motion in Support of the Original Ruling which contains discussion of case law on September 21, 1976. At page 2 of this motion it states that Joint Resolution 48 was challenged in this case prior to the condemnation proceedings which were brought approximately two years later, and, citing *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), it argues that "the Fourteenth Amendment draws no bright lines about three day, ten day or fifteen day deprivations of property." *Shevin*, however, dealt with a pre-deprivation process situation in which the Court held that due process required a prior hearing before the State authorized its agents to seize property in a debtor's possession. For *Shevin* to be applicable to this case, we would have to conclude that Joint Resolution 48 was in fact a *seizure* of property and further that the owner of such property was not provided any meaningful means by which to assess the propriety of the state's action at some time after the initial taking which satisfied the requirements of procedural due process. As stated in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), the Fourteenth Amendment does not protect against all deprivations of property by the state but only against deprivations without due process of law. As we shall later discuss, Joint Resolution 48 does not constitute a deprivation without due process of law for it never contemplated seizure of plaintiff's property without just compensation but rather the establishment of procedures to obtain acquisition of the property by means of eminent domain proceedings which were in fact filed, in accordance with

law, within a reasonable time after approval of the resolution authorizing condemnation. Plaintiff also cites the case of *Progress Development Corp. v. Mitchell*, 286 F.2d 222, 231 (7th Cir. 1961) in support of its contention that a subsequent condemnation proceeding cannot serve as a bar to the present action. The factual circumstances of *Mitchell* are entirely distinguishable from those present in this case. In *Mitchell*, plaintiffs alleged a web of conspiracy between all individual defendants to deprive them of the right to conduct a corporate enterprise and sought to enjoin condemnation of their property on the ground that all individual defendants named in the complaint conspired to induce the condemnor to abuse its lawful power of eminent domain solely for the purpose of preventing plaintiffs from building residential housings and preventing sales to negroes in violation of their rights and of prospective buyers of such homes. They further alleged that the official action involved was merely a sham to harass plaintiffs and to deprive them of their property thereby precluding construction of an integrated housing project. In this case there are no allegations whatsoever of a conspiracy between defendants and the condemning authorities in the exercise by the latter of their power to condemn or to abuse the eminent domain power nor is there any allegation that the condemnation proceedings presently pending before the state court are a sham used to deprive plaintiff of its property or a discriminatory device. As a matter of fact, Hotel Coamo Springs, Inc. accepted in its answer to the condemnation complaint all of the allegations contained in it as to the declaration of public utility and on the need to acquire and disputed only the amount of compensation which is justly due it. In this case plaintiff's fundamental contention is that Joint Resolution 48 constitutes a taking for it does not provide for notice, hearing and eventual just compensation. The validity of the exercise of the power of eminent domain by filing condemnation proceedings is not disputed. Its claim is based solely on the existence and impact of Joint Resolu-

tion 48 and is limited to the intervening period between the approval of that resolution and the later condemnation proceedings filed pursuant to law. The relevance of these condemnation proceedings, instituted approximately two years after approval of such resolution in which the amount of just compensation is being actively litigated and in which plaintiff has claimed and has the opportunity to present evidence on severance damages and loss of profits due to interruption or termination of its project in addition to evidence of the real value of the springs, cannot be ignored. Contrary to claimants in the *Mitchell* case, plaintiff has never requested that the condemnation proceedings be enjoined. The existence of valid condemnation proceedings pursuant to the general condemnation law of Puerto Rico is of utmost importance in determining whether in fact Joint Resolution 48 constituted a taking without due process. Lest we forget, it has been plaintiff's primary contention from the beginning of this action and its constant theory throughout its memoranda of law that Joint Resolution 48 resulted in paralyzing or freezing its property until the moment the condemnation proceedings were filed. To disregard the existence of the proceedings pending before the state court as well as their relevance to a determination on the constitutionality of Joint Resolution 48 is to decide this case in the abstract.

Finally, upon concluding our summary of the procedural development of this case it should be noted that on September 28, 1978 plaintiff requested a stay on the ground that the conclusion of the condemnation proceeding either by decision of the state court or by means of negotiations of the parties would probably dispose of most of the damage claims and would facilitate the final disposition of this action. Through the years, and as far back as 1979, plaintiff insisted on the stay despite defendants' request that it be lifted urging that the dispo-

sition of the condemnation proceedings would render moot the present action.[9] Although a stay was originally granted, the Court later ordered continuation of the proceedings and it was then that the motion for reconsideration was taken under advisement.

Conscious of the added responsibility which is present when a judge passes judgment on a prior decision issued by one who is unable to reconsider the same because of death, we have considered time and again the positions of both parties and the Opinion and Order of July 12, 1976 which declared Joint Resolution 48 unconstitutional. The factual setting of this case has two distinct stages: the pre-condemnation stage when the complaint was filed seeking that Joint Resolution 48 be declared unconstitutional and the post-condemnation phase after the eminent domain proceedings were commenced in the state courts. The intervening period comprised between one and the other constitutes the span of time within which Joint Resolution 48 allegedly operated as a taking due to its restriction on the property from the announcement of a potential condemnation in the resolution to the actual filing of the condemnation proceedings in the Commonwealth court. It should be noted that this action was filed before a year had elapsed since the approval of the resolution. The condemnation factor existing since the filing of the eminent domain proceedings was not taken seriously until reconsideration of the Opinion and Order was requested despite the fact that the condemnation proceedings had already begun. The writings of both parties on reconsideration have focused primarily on the existing condemnation proceedings in the local court. Although belatedly, it is convenient that both have finally come around to discussing the single most important factor which had been largely ignored by all before.[10] Having finally acknowl-

---

**9.** Opposition to motion requesting set aside of stay order filed by plaintiff on August 13, 1979, page 2, paragraph (d).

**10.** As stated, whether defendants and their attorney informed or not of the existence of the

condemnation proceedings is irrelevant. The fact is that both parties and the Court were

edged the relevance of the eminent domain proceedings pending against its property, plaintiff now defines the basis for its claim thus: "What the case at bar does involve is that up to the time of filing the expropriation case defendants had been in flagrant violation of plaintiff's constitutional rights from the date the unconstitutional statute (Resolution 48) was enforced and/or applied which application substantially interferes with plaintiff's private property whose value was thereupon destroyed or nullified with consequent abridgment of said plaintiff's rights to the free use and enjoyment thereof." [11]

In addition to seeking declaratory judgment on the constitutional issue, the present action is one for damages under 42 U.S.C. Sec. 1983 through inverse condemnation. The claim for damages depends upon the success of the constitutional attack on the joint resolution.

■ That a statute always has some object or purpose to be accomplished and that the best guide to its meaning is to recognize its purpose is a sound principle of statutory construction. It can hardly be disputed that the purpose of Joint Resolution 48 was to make a legislative expression declaring the land where the thermal springs are located a public utility and determining the need to acquire title to it. A simple reading of its first section reveals the purpose. That the Legislature did not contemplate a seizure of the property by the mere approval of the resolution is manifest once it is considered in its entirety. What the resolution allows is the acquisition of the lands by condemnation or its possession by means of a minimum 25-year lease in order to dedicate it to the public purpose declared. The last sentence of Section 1 reads: "It is also declared that it is necessary to acquire the possession or domain of these buildings and lands to the ends of this resolution." Section 2 provides that the Secretary of the Treasury with the

advice of the Director of Tourism and the Administrator of Parks and Recreation will make an appraisal of the buildings and choose and appraise the land with the purpose of acquiring one and the other by condemnation or acquiring their possession by lease for a minimum term of twenty-five years. Representative Roberto F. Rexach-Benitez, President of the Committee of Natural Resources and Environmental Quality, in stating its purpose expressed that for more than a century the land known as Coamo Springs had been a recreational center for thousands of Puerto Ricans who went there to enjoy its thermal waters, that since 1958 when it was closed because its owner claimed economical loss, the people had been deprived of this unique natural resource which did not exist in other parts of the Island and that the best way of assuring its enjoyment was by acquiring by condemnation or long-term lease the land in which they were found in order that the government develop a public park and a center for vacationing. The expressions of other members of the House of Representatives of Puerto Rico when the resolution was voted upon reveal that they were not contemplating a seizure of the property without compensation but rather its future condemnation pursuant to established legal procedure. In the report made by the presidents of various committees of the Senate, specifically the Committee of Industry and Commerce and the Committee of Socioeconomic Development, it is again stated that the purpose of the measure is to declare the 25 cuerdas on which the thermal springs are located to be of public utility and to establish the necessary procedures to obtain possession or title to these lands. Plaintiff has repeatedly recognized in its various memoranda that it was the *intention* of the Commonwealth of Puerto Rico to acquire the Coamo Springs by condemnation, not that the resolution itself was the equivalent of a seizure. If it is interpreted taking into

---

aware of their existence. Furthermore, the ground advanced by plaintiff in seeking a stay of this action after reconsideration was precisely because of the possible effect of the result of

the condemnation proceedings against plaintiff in the Commonwealth Court.

11. Plaintiff's motion in support of original ruling filed September 21, 1976, at pages 4–5.

account its purpose, context and the opinions expressed by the members of the legislature, it can reasonably be concluded that the resolution stands as a declaration of public utility and as a grant of authority to proceed to condemn. There is no indication that the Legislature intended to bypass the condemnation procedure established in the General Condemnation Law of Puerto Rico. It is well settled that when a legislature authorizes the exercise of the power of eminent domain but fails to prescribe the method by which it may be exercised, if there are in effect general provisions of statute prescribing the procedure for taking land for public use and the method of ascertaining the damages, "such provisions are by implication made a part of the law granting the authority to exercise eminent domain in a particular case, and the method of procedure authorized by the legislature in such case is thus made clear, so that there can be no question as to the jurisdiction of the tribunal by which the power is sought to be exercised." *Nichols*, The Law of Eminent Domain, Vol. 6, Sec. 24.2, page 24–46, revised third edition (1981). The legislature having declared in Joint Resolution 48 the need to acquire plaintiff's private property and having directed that the necessary condemnation proceedings be instituted to obtain it, the most sensible conclusion is that the general statutory scheme setting forth the procedure for condemnation was contemplated to be followed, as in effect it was followed less than two years after its approval. It is one thing to authorize condemnation and another to institute the judicial condemnation proceeding itself.

▆ The general condemnation statute of Puerto Rico is a procedural one, 32 LPRA Sec. 2901, *et seq.* Section 2905 which outlines the mechanism provides that in all cases in which acquisition of a property, right or easement has been authorized by a law for public purposes, the Commonwealth of Puerto Rico or its instrumentalities can condemn it by filing the corresponding action of eminent domain in the Superior Court of San Juan in the ordinary manner ordained by law for the exercise of civil actions. The approval of Joint Resolution

48 and the subsequent filing of condemnation proceedings against plaintiff's property in the Superior Court of San Juan fall squarely within this statutory framework. The legislative determination and the later condemnation proceedings in court mark the steps outlined in Section 2905. Plaintiff has both misconceived the scope of the Resolution and the procedure for condemnation established in the statute. Joint Resolution 48 is nothing but a formal authorization to proceed to condemn, a preliminary step to the filing of the judicial condemnation proceedings. As such, it constitutes a legitimate exercise of power by the Legislature. It merely sets forth a goal to be attained. We fail to understand how a two year restriction resulting from Joint Resolution 48 can constitute a deprivation of a legal right when it has been established by statute that a property can be reserved without condemnation for an eight year period, 32 LPRA Sec. 2915.

▆ The Supreme Court of Puerto Rico has said that "[w]hen the Legislative Assembly itself, which exercises a power of condemnation of the state either by itself or by delegation, makes a determination of public utility or public interest, the power of the courts to contradict that determination is little less than imperceptible." *Commonwealth v. Rosso*, 95 PRR 488, 524 (1967). The required rational connection between the legislative declaration and the object sought by it is also present here—a declaration of public utility and authorization to eventually obtain title by condemnation. A law may not be annulled unless palpably in excess of legislative power. *Nebbia v. People of State of New York*, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934).

▆ Having concluded that Joint Resolution 48 is an action within the power of the legislature, we must now determine if its *impact* upon plaintiff's property created a taking without just compensation as it claims. In *Danforth v. United States*, 308 U.S. 271, 286, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939) the Court said that "[t]he mere enactment of legislation which authorizes con-

demnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail" and "[a] reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." *Id.* at 285, 60 S.Ct. at 237. This notion was reiterated in *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2128, N.9, 2138, 65 L.Ed.2d 106 (1980) where the Court, citing *Danforth, supra*, and other cases, observed that "mere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are instances of ownership" and that pre-condemnation activities do not constitute a taking. Joint Resolution 48 did not convert the Commonwealth government into a seizer of private property without due process in this case. In a situation in which the legislature has authorized condemnation and such authorization is followed a reasonable time thereafter by the institution of condemnation proceedings in which a trial and compensation are allowed it cannot fairly be said that there has been a taking without due process. To sustain this contention, one would have to conclude that the two year period that elapsed between approval of the legislative measure authorizing condemnation and the filing of judicial condemnation proceedings constitutes, in itself, a deprivation of property without due process.

Plaintiff has claimed throughout these proceedings that Joint Resolution 48 operated in a manner analogous to a "P" classification by the Planning Board. However, for regulation of property to go beyond a valid exercise of the police power it must be oppressive and must restrict the property for an unreasonable amount of time. Assuming the resolution to be a zoning restriction, it is not oppressive since condemnation proceedings were filed two years after its approval. Even if the court were to declare it an oppressive regulation, the remedy would be voiding the offending restriction and not forcing the state to purchase the property. *Pamel Corp. v. P. R.*

*Highway Authority*, 621 F.2d 33, 36 (1st Cir. 1980). Since the state has already taken the steps to acquire the property by condemnation, a claim which could result in voiding the restriction is moot.

It seems that the confusion which our Circuit pointed out in *Pamel, supra*, sown by loose language that excessive land use regulations effectuate a taking, is also present in this case. In the Opinion and Order of July 12, 1976 the Court found that the magnitude of the diminution of plaintiff's property rights was sufficient to constitute a taking, specially in view of the long standing rule in this jurisdiction that plaintiff has a vested right to continue its project because of the approvals obtained from the government and the substantial expense incurred pursuant to such approvals. The only case in Puerto Rico cited by the court and by plaintiff in support of this long standing rule is *Phi Delta Pi v. Planning Board*, 76 PRR 585 (1954) where the Court held that once a construction permit has been issued by a duly authorized official and the person who has obtained the permit acted pursuant to the same and incurred in substantial expenses, the right obtained by virtue of the construction creates a vested right which the government cannot destroy by revoking the permit. If we transplant that rule to our present case, we would be confronted with the situation in which the right of the state to exercise its power of eminent domain would be seriously curtailed and possibly nullified since the mere prior approval by any government agency of a permit would bar the state from utilizing its condemnation power. To hold that plaintiff's vested rights in the property, stemming not from the fact of ownership but from investments, however substantial, constitute a bar or estoppel to the exercise by the state of its power of eminent domain is to condition that power by making it subject to the existence or nonexistence of prior investments and development of the property condemned. This could lead to the absurd situation, not totally absent here, in which a plaintiff could oppose condemnation proceedings brought pursuant to law

and in compliance with due process requirements even though the declaration of public purpose by the condemning authority and the need for condemnation were undisputed and despite the fact that in the determination of just compensation these elements of damages are being considered. As stated in *Kohl, et al v. United States*, 91 U.S. 367, 23 L.Ed. 449 (1875), no one doubts the existence in the state government of the right of eminent domain a right distinct from and paramount to the right of ultimate ownership. The right is the offspring of political necessity and inseparable from sovereignty. Property rights are not absolute and "equally fundamental with the private right is that of the public to regulate in the common interest. . . ." "[T]he guarantee of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious and that the means selected shall have a real and substantial relation to the objective sought to be (obtained)." *Nebbia, supra*, 54 S.Ct. at 523.

The damages claimed are simply a consequence of the fact that condemnation proceedings were instituted and not because those proceedings were commenced a day after the approval of the resolution or twenty-four months thereafter. The value of the thermal springs, severance damages and any damages for loss of business due to the condemnation are all part of the assessment of damages being considered by the Superior Court of San Juan. In those proceedings plaintiff has the opportunity to present evidence not only of the value of the land itself but on severance damages to the remnant and on the loss suffered by its business interests due to the condemnation, if any. Plaintiff has a meaningful remedy in the Commonwealth court and the taking of his property cannot in fairness be labelled as one in violation of due process guarantees. To also assess and allow damages in this action would amount to double compensation. Worse yet, it constitutes an unjustified finding that a two-year restriction on property later condemned is an unconstitutional taking.

In sum, we hold that Joint Resolution 48 was meant to declare the lands of public utility and to authorize the institution of condemnation proceedings in its day. The resolution was an exercise of legitimate legislative power which merely declared a public policy and granted permission to condemn. The ensuing period after its passage and actual institution of condemnation proceedings equivalent to a two year period does not constitute an unreasonable length of time during which the property was enveloped by a cloud of potential condemnation. At most it was a temporary restriction on the property and its development, analogous to the "P" zoning classification, which terminated upon the acquisition through condemnation of the land. When plaintiff filed this action it bitterly complained that despite its efforts, the government had not exercised its power of eminent domain on this particular property. When the government does so, scarcely a year after filing, it then complains that it was deprived of its property without compensation on account of the restrictions for two years placed by the resolution until condemnation. All the damage claims are causally related to the very fact of the condemnation itself and the alleged loss of "vested rights" on account thereof, not to the impact of a simple legislative resolution whose only purpose was to make a declaration of public utility and to authorize establishing condemnation proceedings.

For the reasons stated, we hold that Joint Resolution 48 is constitutional and, therefore, order the dismissal of the complaint since there was no taking of plaintiff's property in the constitutional sense.

SO ORDERED.