Hector Luis Fuertes ROMEU and Rene Javier Fuertes Romeu, minors, whose appearance is complemented by their guardian William R. Fuertes, William R. Fuertes; Isabel Maria Fuertes, Jaime Fuertes Romeu; Alberto Rafael Fuertes Romeu; Carmen Ana Fuertes Romeu, Magdalena Sofia Fuertes Romeu; Maria Soledad Fuertes Romeu; and Roberto Rafael Fuertes Romeu, Plaintiffs,

v.

HOUSING INVESTMENT CORPORATION; Chase Manhattan Overseas Banking Corporation; Centro Associates L.P.; Productos Libby's International Inc.; William Salva Matos, personally and as Administrator of the Administration of Regulations and Permits of Puerto Rico; Antonio Joglar Moreno, personally and as Director of the Bayamón Regional Office of the Administration of Regulations and Permits of Puerto Rico; Miguel A. Rivera Rios, personally and as President of the Puerto Rico Planning Board; Luis E. Biaggi and Jose G. Alcala personally and respectively as Vice President and Associate Member of the Puerto Rico Planning Board; Carlos E. Polo, Judge of the Superior Court of Puerto Rico, Bayamón Part; John Doe and Richard Roe as the persons operating the bulldozers over the property of Plaintiffs and the subcontractors or any other persons effectuating any entry into or act upon the property of Plaintiffs contrary to the rights of Plaintiffs, Defendants.

No. Civ. 78-0743CC.

United States District Court, D. Puerto Rico.

Sept. 29, 1982.

Luis P. Costas-Elena, Santurce, P.R., Manuel Moreda-Toledo, San Juan, P.R., for plaintiffs.

David Carrión-Fuentes, Pedro A. Del Valle-Ferrer, Federal Litigation Div., Dept. of Justice, Eduardo Estrella, Fiddler, Gonzalez & Rodriguez, San Juan, P.R., for defendants.

## MEMORANDUM OPINION

CEREZO, District Judge.

On April 27, 1978 plaintiffs filed this civil rights action and requested a temporary restraining order to prevent an allegedly unconstitutional interference with their property. Two weeks later Chief Judge Toledo dismissed the complaint on principles of abstention since at that time there was an almost identical lawsuit pending in the Superior Court of Puerto Rico which also sought similar injunctive remedies. The dismissal judgment was appealed and reversed. The action was remanded. On appeal it was resolved that this Court should not have taken action without first giving plaintiffs an opportunity to present opposing arguments to the abstention-based dismissal. It was suggested that plaintiffs' complaint could probably not withstand a motion to dismiss unless amended. After spending almost twelve months ruminating on this advice, plaintiffs on March 27, 1980 decided to request leave to amend the complaint and tendered a sixty page compilation of unnecessary, redundant and, at times, even malign statements that wallow aimlessly among incessant incantations of the word "conspiracy" and all its related derivatives.

Before this sixty page amended complaint was tendered, there were Motions to Dismiss and for Summary Judgment which together with the oppositions to the request for leave to amend must now be examined. This Court, with great difficulty, due to the numerous memoranda filed during four years,[1] finds that defendants' motions for dismissal and summary judgment are also related to their opposition to the request for leave to amend in that both essentially urge the failure to state a cause of action. We shall thus review these motions to determine if defendants' fundamental opposition is dispositive of the action.

Plaintiffs are the owners of a 42% interest in two parcels of land (Parcels D & E) of approximately six cuerdas located in an in-

---

1. This case is a sorry example of how disregard for the simple procedural guidelines of order in presenting legal memoranda in support and in opposition of motions (see Rule 8 Rules of the United States District Court for the District of Puerto Rico, Local Rules) can create an almost impenetrable chaos of papers. The parties, taking advantage of administrative lags caused by the reassignment of this case to different judges, have filed a barrage of repetitive memoranda that have turned the case into a mammoth seven volume file at a stage in which not even a pretrial hearing has been held. We call the parties' attention to Local Rule 8(O) which states:

 "The presentation to the Court of unnecessary motions and of unwarranted opposition to motions, which may unduly delay the course of an action, subjects the offender to appropriate discipline or to imposition of costs."

dustrial area near San Juan. They inherited this interest from their father, Mr. William Fuertes, while the other 52% interest was acquired by their mother Isabel Romeu, a defendant in this case. On November 20, 1974, Isabel Romeu signed on behalf of her children, the heirs of William Fuertes, a letter addressed to Rafael Alonso Alonso and Adalberto Colón, (President of the Planning Board of Puerto Rico and Director of the Land Division respectively—neither of whom are parties to any of the complaints—) consenting to the use of a provisional access through parcel D by Constructora San Miguel Martinez, Inc. (Constructora) through Capacete, Martin & Associates (Capacete). Constructora had acquired from the Fuertes heirs the adjoining 120 cuerdas lot on which they were preparing an industrial complex of warehouses to be called Centro de Distribución del Norte. On March 19, 1975, Luis Arnaldo San Miguel, Constructora, Capacete and Angel Herrera, as petitioners, obtained from the director of the Bayamón Regional Office of the Administration of Regulations and Permits (ARPE) report # 75-9-0032 which approved partial construction plans for their warehouse project. This report made the following reference to the consent signed by Isabel Romeu:

> By means of communication of November 20, 1974 Mrs. Isabel R. Widow of Fuertes Garzot, has informed to be in conformity that part of her lands be used for a provisional access which will connect the project with Road Number 869, until the works of construction of Las Palmas Avenue are concluded.

Sometime in the month of January 1978 plaintiffs noticed that some trucks and construction vehicles were trespassing on their property and decided to fence it off to discourage the intrusion. Defendant Housing Investment Corporation (Housing), by letter dated February 18, 1978, informed plaintiffs that they had acquired the 120 cuerdas property from the previous owners and were going to enter and utilize plaintiffs' property pursuant to the consent given by Mrs. Romeu and Report 75-9-0032 from ARPE. Since plaintiffs did not remove the newly erected fence, Housing filed a complaint in the Superior Court of Puerto Rico, Bayamón Part, Civil 78-804, against plaintiffs herein, Isabel Romeu and Land Investment Trust Co. Ltd.[2] seeking injunctive relief to prevent them from interfering with Housing's use of the access road. Plaintiffs responded with a counterclaim and in turn the Bayamón Court granted them injunctive relief preventing Housing from interfering with their property rights. At the same time that plaintiffs were answering and counterclaiming in the local case, and undaunted by their lack of success in obtaining removal to this forum,[3] they filed this action seeking five million dollars in damages, injunctive relief, and other remedies due to an alleged conspiracy to deprive them of their civil rights as guaranteed by the Fifth and Fourteenth

---

**2.** In order to perceive the proper configuration of this case it should be mentioned that on March 14, 1978 Land Investment Trust Co. Ltd. (Land Investment) a corporation organized in the British Virgin Island of Tortola filed a complaint in this Court (78-435) against Housing. The basis of this complaint was basically the same trespass action that is alleged in the present action. Jurisdiction was premised essentially on the diversity of citizenship of the Tortola based corporation. Isabel Romeu had transferred all her property interest to said corporation for $1,332,845 of which $5,000 were paid at the time of execution and the rest was to be paid on December 31, 1980, four years after the deed was executed. After a deposition of an officer of Land Investment was taken, plaintiff decided to abandon the case and filed a voluntary dismissal. Judgment

was entered and after a motion for attorney's fees was denied the matter seemed closed until plaintiffs raised a zealous opposition to the filing of the depositions. The District Court as well as the Circuit Court did not sustain plaintiffs' opposition and the depositions were filed. We have examined them and it appears that the reason plaintiff opposed their filing is that they cast some doubt on the validity of the transfer. Later Land Investment and Isabel Romeu signed a document invalidating the transfer.

**3.** Plaintiffs also sought removal of 78-804 but by order of April 24, 1978 the case was remanded for want of jurisdiction. (78-439J.T.) Three days later the present complaint was filed.

Amendments and 42 U.S.C. Secs. 1983, 1985 and 1986. Jurisdiction is premised on 28 U.S.C. Sec. 1331. It should be noted that plaintiffs have continued filing claims related to the property in dispute in the courts of Puerto Rico, to wit: *Children of William Fuertes v. Constructora San Miguel, et al.,* filed December 21, 1979 (79–7989); *Héctor L. Fuertes Romeu (minor) by William Fuertes, et al. v. Constructora San Miguel et al.,* filed July 16, 1980 (80–2685).[4] Both of these cases have been consolidated with Civil 78–804 in the local court. The Commonwealth of Puerto Rico has also filed an expropriation proceeding against plaintiffs and Isabel Romeu (and Bay Properties, Inc., Levitt & Sons Inc.) The impact of the final judgment of the expropriation case on the present proceedings will be discussed further on.

Mindful of the difficulty of discerning the usually concealed elements of a conspiracy, we take to the task of "sifting the facts" to see if, allowing the proper inferences and giving the consideration owed a party opposing a summary judgment, the ugly contours of a conspiracy and the involvement of the state surface from the myriad allegations and memoranda of plaintiffs. See: *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

We must first review the allegations of the original verified complaint which in essence state the following: William Salva Matos (Administrator of ARPE), Antonio Joglar Moreno (Director of ARPE's Bayamón Regional Office), Luis E. Biaggi, Miguel A. Rivera Rios, José G. Alcala (members of the Planning Board of Puerto Rico) allegedly conspired with Housing, Chase Manhattan Overseas Banking Corporation (Housing's parent corporation, "Overseas") Centro Associates L.P. (CALP) and Productos Libby's International Inc. (Libby's) to deprive plaintiffs of the use of part of their land without compensation or due process. Plaintiffs contend that ARPE's Report 75–9–0032 was based on an illegal consent since, according to Article 159 of the *Civil Code of Puerto Rico,* P.R. Laws Ann. Tit. 31 Sec. 616, the consent of the minor Fuertes heirs had to be obtained at that time by judicial authorization. It is also contended that the report was obtained without ever notifying plaintiffs of any of the proceedings before the Planning Board or the Regional Office. Based on this allegedly invalid permit, Housing started constructing an access road through plaintiffs' land and utilized the permit as a "badge of authority," together with the letter of consent, to justify its use of the access. Housing is also charged with violating plaintiffs' privacy rights by making threatening phone calls.

Plaintiffs do not mention the role that Libby's and CALP played in the conspiracy aside from the fact that they allegedly owned and/or rented some of the warehouses in the adjoining lot. Neither do they allege how defendant Carlos E. Polo, a Superior Court Judge, got involved in the conspiracy other than the bare assertion that he was the presiding judge in case 78–804.[5] A puzzling omission in this verified complaint is the absence of any allegation connecting plaintiffs' mother, defendant Isabel Romeu, with the conspiracy. The only allegation as to her part in these events is her

---

4. Plaintiffs obtained judgment by default against Constructora San Miguel declaring that no right of easement ever existed on their property. Housing intervened claiming that plaintiffs' lawyer, because of the many pending actions (also plaintiffs herewith lawyer—Mr. Costas Elena) knew that Housing was now the owner of the adjoining property and claimed the right to use the access. The Court vacated its order, consolidated with 78–804, and reprimanded plaintiffs' lawyer for failing to inform the Court of the other proceedings.

5. The complaint states:

12) Carlos E. Polo is sued in his official capacity as the Judge of the Superior Court of Puerto Rico, Bayamón Part, that has before him Civil Case No. 78–804, wherein through fraudulent joinder and absence of necessary parties, Housing Investment Corporation seeks to enjoin Plaintiffs (although many of them have not even been served with summons or other process) from enjoying their property rights protected by the United States Constitution.

A review of the record indicates that Judge Polo is not the presiding Judge in 78–804.

failure to obtain the proper judicial authorization as to her minor children. The claim against unknown defendants sued as the persons or entities conducting the construction activities within plaintiffs' land was voluntarily dismissed.

On September 18, 1979, Housing and Overseas filed Motions for Summary Judgment with accompanying affidavits and documents essentially contending that they have not conspired with any state officer nor participated in the petitions for the Planning Board-ARPE report and construction permit and that, there being no state action, the suit is in reality one for trespass which should be dismissed for failure to state a cause of action and/or for lack of federal jurisdiction. Defendants' accompanying papers reveal that the previous owners of the land, Centro de Distribución del Norte, Inc. (Norte) and Constructora San Miguel Martinez, Inc., and the construction firm Capacete, Martin & Associates (Capacete) were the ones that obtained Isabel Romeu's consent and that subsequently requested the construction permits. The only relationship of these movants with Norte, Capacete and Constructora is that Housing financed the project to build the warehouses and that they acquired the 120 cuerdas by foreclosing the mortgage on that property in mid 1977 when Norte and Constructora defaulted on the loan payments. In January 1978, Housing was trying to continue the use of the access road that had previously been utilized by Constructora.

The state officers filed a Motion to Dismiss on August 22, 1979 for failure to state a cause of action. They allege that there are no specific overt acts attributed to them constituting a conspiracy, that Judge Polo is immune from suit, that the matter is purely local, and that no substantial federal question exists. In the alternative, the state officers suggest that the Court abstain from exercising its jurisdiction due to the existence of a similar case in the local forum, Civil 78–804, which will render unnecessary the resolution of the federal constitutional questions raised in the present case. In later supplemental memoranda and documents other matters have been brought up,[6] such as the contention that the officers were acting within the scope of their discretion, that respondeat superior does not apply to civil rights actions and that the action is time barred.

A hearing was held on June 8, 1981 to discuss the issues and legal controversies outlined above. The disorderly filing of legal memoranda and supporting documents prompted the Court to grant a final extension of thirty days on April 6, 1982 to present any additional documents the parties deemed necessary to comply with the authentication requirements of Rule 56(e) Federal Rules of Civil Procedure, before finally disposing of the pending matters. The parties have filed what they deem necessary to support their positions.[7]

---

**6.** Plaintiffs' recent battle cry has been the existence of federal jurisdiction based on 12 U.S.C. Sec. 632. They contend that since Overseas is an "Edge Act" banking corporation the aforecited section establishes the jurisdiction of this Court. Aside from the fact that the federal incorporation of Overseas has not been properly pleaded in none of the complaints as a jurisdictional basis according to the criteria of *Louisville & N.R. Co. v. Mottley*, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911) and its progeny, this jurisdictional statute is directed at cases arising from transactions or other financial operations of banking institutions. *Díaz v. Pan American Federal Savings & Loan Ass'n.*, 635 F.2d 30, 31 (1st Cir. 1980). Plaintiffs have failed to demonstrate how their cause of action arises from a banking transaction. A conspiracy to commit a trespass is not even remotely close to what has been recognized as tradition-

al banking activities. See: 12 U.S.C. Sec. 1464(b) and (c); *First Federal Savings and Loan Ass'n. of P.R. v. Zequeira*, 305 F.Supp. 37 (D.C.P.R.1969).

**7.** Duly certified and translated copies of the judgment of the Superior Court of Puerto Rico, San Juan Part and the Supreme Court's Judgment affirming the appealed expropriation proceedings, Case No. 78–229. The Court had granted the parties (and on plaintiffs' request) ninety (90) days in order to discuss a possible settlement. Plaintiffs filed a motion informing the Court that no settlement was possible. However, plaintiffs took the opportunity to include in said motion a mini brief on the merits of their action, a three-page affidavit and a blueprint of the site all apparently ignoring the Court's effort to impart some order to the chaotic unending flow of repetitive memoranda.

Before the Court could pass on these motions to dismiss and, almost twenty-four months after the complaint had been filed and extensive discovery conducted, plaintiffs requested leave to amend. In the amended complaint tendered new characters appear in the conspiracy scheme while others have been eliminated.[8] The conspiracy has been extended to encompass almost a decade of conspiratorial activity. New causes of action have been added while others have been abandoned (i.e. the invasion of privacy). Plaintiffs now include Luis A. San Miguel, Constructora, Efraín Echandi, Capacete, and Angel Herrera as conspirators because they were the ones who allegedly obtained Isabel Romeu's consent "through fraudulent means" and who conspired with the Planning Board and ARPE officials to obtain the construction permit.[9] It is also claimed that there was a violation of the equal protection of the laws in issuing Report 75–9–0032 because ARPE did not require a public deed from Isabel Romeu attesting to the consent for the temporary access while it requested one from Levitt & Sons Inc., an adjoining land owner, to provide for a pluvial easement. Plaintiffs also allege that the conspiracy continued with Housing, Overseas and Chase Manhattan Bank, N.A. (Chase), a new defendant affiliate of Housing, because they were the successors in interest of Mr. San Miguel and Constructora and that the transfer via the mortgage foreclosure and the judicial sale were simulated. Housing, Overseas and Chase, by their petitions to the Planning Board and ARPE after acquiring the land in 1977, allegedly conspired with the government officials to obtain continued reliance on Report 75–9–0032. In addition to their allegation that they were never notified of ARPE's or the Planning Board's decisions, plaintiffs also aver that the plans approved depict construction within their land, deprive part of their land from a corner position and leave another part of it enclaved. There are a number of other acts allegedly committed by Housing such as earth removal, trash and drainage discharge and constructions of canals. Plaintiffs have also added a new cause of action of inverse condemnation by asserting that on June 3, 1975 the Planning Board classified their property as "P" (public use).

The latest corporate defendants included in the amended complaint—Centro Distribuidor del Norte Inc. ("Centro Norte"), Plaza de Diego Inc. ("De Diego") and Bay Properties Inc. ("Bay")—are named as part of the conspiracy because they are allegedly the *alter-ego* of Mr. San Miguel and as such participants in the simulated transfer to Housing. José O. Pérez Miranda is included as a co-conspirator for he was the court-appointed trustee in the foreclosure action. One Miguel A. de Jesús is also named as a conspirator because he allegedly acted in concert with Mr. San Miguel and because he is San Miguel's father-in-law. Centro Associates L.P. (CALP) supposedly conspired as an affiliate of Housing by obtaining some of the warehouses that Housing had in turn obtained from "San Miguel and his corporate interest" in the "friendly foreclosure." Libby's participation in the conspiracy is predicated on its entering into agreements with Housing and the "corporate interests" of Mr. San Miguel to lease one of the warehouses on Housing's property. John Doe and Richard Roe are persons, "including public officials," as yet unknown to plaintiffs who have conspired to deprive them of their constitutional rights. Again, plaintiffs' mother is not mentioned as a member of the conspiracy.

The last member to join this seemingly endless conspiracy is the Puerto Rico Aqueduct and Sewer Authority (PRASA). PRASA's involvement in the conspiracy stems

---

**8.** No mention is now made of Judge Carlos E. Polo. In any event, the doctrine of judicial immunity would prevent the action against him. *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Nor have plaintiffs alleged that Judge Polo conspired with defendants to infuse state action into the claim. See *Dennis v. Sparks,* 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980).

**9.** Plaintiffs now include the agencies themselves as defendants even though the agency officials were sued individually and as representatives for the agency.

from the condemnation proceedings that it initiated against plaintiffs and other adjoining landowners for an access road to its sewage treatment plant.[10] The land condemned was an access road, more or less situated in the same position as the disputed access road, of approximately 3,042 square meters. Plaintiffs allege that the condemnation is clearly for Housing's private benefit and that PRASA was induced by Housing to commence condemnation. To this end, plaintiffs have presented various letters between Housing's officers and PRASA indicating that there were eleven alternatives to using plaintiffs' property but plaintiffs' was the most feasible and that Housing and PRASA would benefit mutually from the building of this other access road. Similar defenses were raised by plaintiffs in the condemnation action case but were rejected by the Court. The Supreme Court of Puerto Rico also rejected plaintiffs' contentions.

There are also references in the amended complaint to another civil action against Constructora and the Planning Board and an alleged conspiracy by defendants to interfere with witnesses and withhold evidence in this case. The amended pleading further alleges that there was an invidious discrimination against them because they are the children of William Fuertes.

■ Pursuant to Rule 15, FRCP, before leave to amend is granted, prejudice to the opposing party must be considered. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). According to *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222

(1962), prejudice can manifest itself in: (1) undue delay, (2) bad faith efforts to stall the proceedings, (3) repeated failure to cure deficiencies in the complaint by previously granted amendments, or (4) futility of purpose in the amendment. *Foman v. Davis,* at 182, 83 S.Ct. at 230. Although plaintiffs have not justified the delay in adding so many new parties and causes of action to their complaint,[11] it is not necessary to discuss these matters or the need to strike many of the repetitive allegations because the filing of the tendered complaint is a futile effort since neither the original verified complaint nor the amended complaint tendered state a valid cause of action.

Plaintiffs first claim violations of 42 U.S.C. Sec. 1985(2) and (3) and 1986. These are based on the allegation that the Planning Board and ARPE treated them unequally when they accepted as sufficient the consent letter of Isabel Romeu for the provisional access in violation of their own Rules and Regulations, particularly 23 Rules and Regulations of Puerto Rico Sec. 10–358(3)(B),[12] and in contradiction to the report which mentions that a public deed was required from Levitt & Sons Inc. to establish a pluvial servitude on its land. Plaintiffs contend that Housing and Overseas conspired with the defendant government officials to obtain this special treatment.

■ While violations of Section 1985 do not need the element of state action, they do require an invidious class-based discriminatory animus. *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d

---

10. *Commonwealth of Puerto Rico v. Bay Properties Inc., Levitt & Sons, Inc., Isabel Romeu and Sons,* Superior Court (San Juan Part) E78–228, E78–229, June 21, 1978.

11. Since September 1979 plaintiffs, without having to go through the trouble of requesting a document from the agency, knew who were the petitioners of Report 75–9–0032 since defendants Housing and Overseas included in their Motion for Summary Judgment this information. Since 1975, the property was classified as public and this information is accessible to interested parties. See: P.R. Laws Ann. Tit. 23, Sec. 636. The agencies could have been

included from the beginning in the complaint. There is very little in the amended complaint that plaintiffs did not know or should have known in the early stages of their action.

12. "The inscription plans require copies of the public deeds establishing the easements and restrictions that are demanded in the subchapter and provided in the plans of notification." We note that the mere violation of an agency's rules does not create a due process violation. There must be a showing of selective enforcement. See: *U. S. v. Cáceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

338 (1971); *Hahn v. Sargent,* 523 F.2d 461, 469 (1st Cir. 1975). "[T]he complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious." *Harrison v. Brooks,* 519 F.2d 1358, 1360 (1st Cir. 1975). Assuming that the Planning Board's omission to request additional evidence supporting Isabel Romeu's consent for a provisional access was in fact unequal treatment sufficiently unreasonable as to constitute a violation of the equal protection of the laws, or a deprivation of some legal right,[13] plaintiffs have not asserted that because of their membership in a class they have been invidiously discriminated against. In fact, their bare allegation is that they belong to a class designated only as "the children of William Fuertes." This is clearly insufficient to establish the requisite characteristics to constitute a class within the meaning of 42 U.S.C. Sec. 1985. See: *Savina v. Gebhart,* 497 F.Supp. 65, 68 (D.Md.1980). Even granting that the "children of William Fuertes" constitutes some sort of protected class, there is no indication that the alleged discrimination was *because* plaintiffs were the children of William Fuertes since the damage to the property was equally suffered by the other owners of the property interest Isabel Romeu and Land Investment Trust Co. Ltd. when this company was owner of a 52% interest. Rather, it is the fact that they happen to be owners of part of the property interest that might have caused them to be harmed by the alleged trespass. Since class-based animus is absent from plaintiffs' allegations, and there is no basis to conclude that the permit was selectively enforced, they have

failed to state the necessary elements to sustain a cause of action against defendants based on 42 U.S.C. Sec. 1985(2), (3) or Sec. 1986.[14] See: *Lessman v. Mc Cormick,* 591 F.2d 605 (1st Cir. 1979); *Hahn v. Sargent, ante* at 470.

 Plaintiffs also claim that there has been a conspiracy to deprive them of constitutionally protected rights to due process and base this part of their action on 42 U.S.C. Sec. 1983 as the enabling statute. This cause of action does not need the invidious class-based animus of section 1985, but it requires other factors such as an involvement by the state with one of the private conspirators so as to incorporate the element of state action in the conduct complained of, *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 149, 152, 90 S.Ct., 1598, 1603, 1605, 26 L.Ed.2d 142 (1970); *Monroe v. Pape,* 365 U.S. 167, 184, 187, 81 S.Ct. 473, 482, 484, 5 L.Ed.2d 492 (1961), and that this conduct deprive a person of rights, privileges or immunities secured by the Constitution or laws of the United States, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). The deprivation claimed in this case points to an action in trespass rather than to a constitutional deprivation. Contrary to plaintiffs' assertion that they have a constitutionally derived absolute right of property, the Supreme Court has stated that property interests: "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct.

---

**13.** As we shall later discuss, Report 75–9–0032 does not have the legal effect of creating an easement over plaintiffs' land nor did the widow's consent constitute a clear act of disposition of property requiring judicial authorization for the minors.

**14.** Plaintiffs' allegations in the amended complaint to the effect that defendants have conspired to withhold testimony pursuant to the first part of 42 U.S.C. Sec. 1985(2) are based on documents that some defendants have allegedly not produced on Motions for Production of Documents and because of failure to appear at

depositions in the discovery proceedings in this case. This is insufficient to comply with the requisites of this section and is irreconcilable with the language of the statute which clearly refers to deterrance of parties or witnesses from attending or testifying *in court.* What plaintiffs are referring to in these allegations are situations covered by the Federal Rules of Civil Procedure concerning ordinary discovery (Rules 26–37). This puerile bickering of lawyers on discovery matters does not constitute a basis for a 1985(2) action.

2701, 2709, 33 L.Ed.2d 548 (1972). It is not the right of property *per se* which is protected by the Constitution but rather the right to safeguards of adequate process whenever the state, an agent of the state, or somebody acting in concert with the state perpetrates actions against an individual's property of such magnitude as to constitute a deprivation. "The Fourteenth Amendment protects only against deprivations 'without due process of law.'" *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981).

■ Having previously determined that plaintiffs' claims do not amount to a legitimate equal protection action, the rest of their allegations are, in effect, fundamentally related to a due process claim. A valid due process claim must satisfy these prerequisites: (1) the defendants must have acted under color of state law or the state must be involved to constitute the necessary state action to sustain constitutional claims; (2) the matter lost or damaged must fall within the definition of property, and (3) the alleged loss or injury to the property must amount to a deprivation. *Id.* It is unquestionable that the trespass actions of Housing and Overseas, if taken as true, constitute an injury to property. Plaintiffs believe that the issuance of the permit along with the trespass actions by defendants Housing and Overseas constituted the state's deprivation of their property. However, the claim must contain all three prerequisites to be valid; each one of them standing alone is insufficient. *Id.*

■ In examining the nature of the state defined property rights and the relationship involved, we must first ascertain if the issuance of permit 75–09–0032 by itself constituted a deprivation of property. The Supreme Court of Puerto Rico has held that the mere reference to an easement in a report or map approved by the Planning Board or ARPE does not invest the reference with property rights. In *Benet v. Registrar,* 65 PRR 460 (1945) the Court determined that the inclusion of a space reserved for a projected street in a Planning Board Report was insufficient to establish a right of easement:

Section 475 of the Civil Code (1930 ed.) provides that: 'continuous and not apparent servitudes and discontinuous servitudes, either apparent or not apparent, can only be acquired by virtue of a title,'....

The report approved by the Planning Board does not constitute any title of servitude of right of way nor does it have the effect of creating an easement which may be the subject of an entry in the registry...." *Id.* at 465.

See also *Goenaga v. O'Neill de Milán,* 85 PRR 162 (1962) (approval of plans with street layout did not create an easement for a municipality). In fact, the limited legal effects of an approval by the Planning Board or ARPE is demonstrated in that: it does not *ipso facto* render ineffective additional restrictions on the land imposed by private covenants and equitable servitudes. *Sands v. Ext. Sagrado Corazón Inc.,* 103 DPR 826 (1975); *Colón v. San Patricio,* 81 PRR 236 (1959); *Pérez v. Pagán,* 79 PRR 185 (1956); or invalidate private restrictions which are inconsistent with the permit granted. *Rodriguez v. Twin Towers Corp.,* 102 DPR 355 (1974); nor does it legalize a clandestine structure, *Commonwealth v. Mercado Carrasquillo,* 104 DPR 784 (1976); or release from civil liability the owner of a building erected on the basis of the plans approved. *Santaella v. Licardi,* 83 PRR 855 (1961). Although zoning regulations and determinations may create a vested interest between the petitioner and the planning agency, see *Phi Delta Phi v. Planning Board,* 76 PRR 547 (1954), they are not contractual rights and the agency has ample discretion in modifying them when necessary. *Texaco Inc. v. Secretary of Public Works,* 85 PRR 686 (1962). Only in a situation whereby the Planning Board ordered petitioner to provide for a legal servitude did the Supreme Court of Puerto Rico deviate from the general principle that a planning agency's approval does not create property rights enforceable against third parties. *Borges v. Registrador,* 91 PRR 106 (1964). Permit 75–09–0032 does not even

mention that an easement will be established on plaintiffs' land. It only makes reference to a consent to use a provisional access and makes the following admonition to petitioners:

"It is warned that this approval does not in any way imply that the adjacent property owners are deprived of the right to exercise any legal action to protect their property...."

 In the sphere of government regulations there is no set formula to determine where regulation ends and taking begins. Yet, for there to be a "taking" requiring compensation and due process safeguards it is paramount that the government action substantially deprive an owner of the legal control, use or enjoyment of his property. *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). The deprivation must subtract from the owner's full enjoyment of the property and limit his exploitation of it. *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). It is not necessary that the property be totally displaced by a physical takeover; actions that create involuntary easements on the property have been considered as takings, see: *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), *United States v. Causby, ante* (flight paths of low flying aircraft over property) or that damage substantially the land, *Pumpelly v. Green Bay Co.,* 80 U.S. 166 (13 Wall. 166), 20 L.Ed. 557 (1872) (flooding); *Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922) (firing of a cannon). However, not every deprivation of use, possession or control of property is a taking. There must be an accompanying abridgment or transfer of the legal powers of enjoyment such as would create or alter property rights if the actions were performed between private parties. See: *United States v. Dickinson,* 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947); *National-by-Products, Inc. v. United States,* 405 F.2d 1256, 1273, 1274 (Ct.Cl. 1969); *Chacon v. Granata,* 515 F.2d 922, 925 (5th Cir. 1975), *cert. denied,* 423 U.S. 930, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). See generally: 2 Nichols', *The Law of Eminent Domain,* Sec. 6.1(1) p. 6–15 (1978 ed.); L. Tribe, *American Constitutional Law,* Sec. 9–2, p. 460 (1978 ed.)

In *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646 (1st Cir. 1974) a controversy arose on whether new regulations issued by the Environmental Protection Agency on the use of airport parking spaces could be considered a taking in the constitutional sense. Our Circuit held that these regulations could not have been considered a taking since the parking owners' right to use was not extinguished entirely nor was it transferred to anyone else. The Court states at page 679:

"(a) diminution of profits or a requirement that some loss be suffered is not enough, when all other accoutrements of ownership remain, to be a 'taking.'"

The Supreme Court in a zoning case held that certain city ordinances did not amount to a taking since they did not prevent the best use of the owners' land nor extinguish a fundamental attribute of ownership. *Agins v. City of Tiburón,* 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980). On the claim that the city's pre-condemnation proceedings constituted a taking, the Court said at 263 note 9, 100 S.Ct. at 2142 n. 9:

The State Supreme Court correctly rejected the contention that the municipality's good faith planning activities which did not result in successful prosecution of an eminent domain claim so burdened the appellants' enjoyment so as to constitute a taking ... even if the appellants ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended....

Cf. *Danforth v. United States,* 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939) (mere enactment of legislation authorizing condemnation is not a taking) *Reservation Eleven Assoc. v. District of Columbia,* 420 F.2d 153 (U.S.App.D.C.1969) (planning before condemnation although adverse to

property interests does not require compensation). See generally: *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1980) and *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

And in *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822 (1st Cir. 1982) in ruling that a town's planning board rejection of a residential housing development project did not constitute a violation of due process the first circuit mentioned:

> Virtually every alleged legal or procedural error of a local planning authority or zoning board of appeal could be brought to a federal court on the theory that the erroneous application of state law amounted to a taking of property without due process. Neither Congress nor the courts, have to date, indicated that section 1983 should have such a reach. *Id.* at p. 831.

In the instant case we are not even dealing with a compulsory limitation by the planning agency imposing on plaintiffs' land an involuntary servitude or a zoning restriction. Under Puerto Rican Civil Law, the permit and plans approved do not have the necessary force to constitute a property right such as an easement. See: Articles 473–478 Civil Code P.R. Laws Ann. Tit. 31 Secs. 1651–1656. Further actions such as the incorporation of Isabel Romeu's consent to a public deed specifically creating an easement, the recording of the deed in the Registry of Property and a mandate by the planning agencies that the provisional access be converted to an easement could have possibly resulted in a final and culminated deprivation of property requiring procedural safeguards. See: *Parratt v. Taylor,* 451 U.S. 527 at 540, 100 S.Ct. 1908 at 1915, 68 L.Ed.2d 420 (1981). The actions of the state as portrayed by plaintiffs' own allegations demonstrate only that defendants obtained a permit without any adverse legal effect on plaintiffs' interest in their land or diminution of their property rights. See: *Florida East Coast Properties, Inc. v. Metropolitan Dade County,* 572 F.2d 1108 (5th Cir. 1978), *cert. denied,* 439 U.S. 894, 99 S.ct. 253, 58 L.Ed.2d 240 (1978).

Since the first inquiry in any 1983 action is whether there has been a deprivation of a right secured by the Constitution of the United States, *Martinez v. State of California,* 444 U.S. 277, 284 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), to state a valid due process claim against the Planning Board plaintiffs had to first establish that the Board's action deprived them of their property rights. The planning agency's approval of permits and plans that may have contained temporary interferences with their property does not have the legal effect of authorizing or perpetuating those intrusions. Permit 75–9–0032 clearly limits its reference to a consent for a temporary access and warns petitioners of its lack of legal effect on property rights of adjoining landowners. Not only is a mere approval of a permit or plan by one of those agencies insufficient to constitute a taking; See: *Goenaga v. O'Neill de Milán, ante,* but there is also no authority in Puerto Rican law granting either the Planning Board or ARPE the power of eminent domain. See: P.R. Laws Ann., Tit. 23, Sec. 42, *et seq.* The constitutional prohibition against taking private property for public use without just compensation is directed against the government and not against individual or public officers proceeding without the authority of legislative enactment. *Hooe v. United States,* 218 U.S. 322, 336, 31 S.Ct. 85, 89, 54 L.Ed. 1055 (1910) (Harlan, J.); *Canlis v. San Joaquín, Sheriff's Posse Comitatus,* 641 F.2d 711, 717 (9th Cir. 1981), *cert. denied,* 454 U.S. 102 S.Ct. 510, 70 L.Ed.2d 383 (1981); *Sun Oil Co. v. U.S.,* 572 F.2d 786, 819 (Ct.Cl.1978). As to Housing's actions based on the permit they were not authorized by the law, the agency or by the permit itself. They are insufficient to constitute a 'taking' of property and thus one of the requirements of a valid due process claim is not present.

The necessary state involvement required to constitute state action also fails to manifest itself properly in plaintiffs' allegations.

**1324**

In discrimination cases the Supreme Court has found that there is state action if the state has: significantly involved itself with the invidious discrimination *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); or encouraged the discrimination *Adickes v. S.H. Kress & Co., ante; Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), commanded or enforced the discrimination, *Lombard v. Louisiana,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); *Peterson v. Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963), *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) or heavily subsidized the discriminator to the extent that a symbiotic relationship has been established whereby both parties benefit from their involvement, *Burton v. Wilmington Packing Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In cases where the claim is one based on due process, the Court has held that the state must compel or order the action complained of to constitute the necessary state action. For example, in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court found that a state utility commission's approval of a private utility company's tariff which included the right of the company to terminate service without a hearing, did not convert the company's service termination into state action because the commission had not "put its own weight on the side of the ... practice by ordering it" *id.,* at 357, 95 S.Ct. at 456. In *Flagg Bros. Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) the Court found no state action in the state's only permitting the unconstitutional action as opposed to compelling it. See: *Waters v. St. Francis Hospital, Inc.,* 618 F.2d 1105, 1107 (5th Cir. 1980). In *Fletcher v. Rhode Island Hosp. Trust Nat. Bank,* 496 F.2d 927 (1st Cir. 1974), *cert. denied,* 419 U.S. 1001, 95

S.Ct. 320, 42 L.Ed.2d 277 (1974) our Circuit decided that the mere passive acceptance by the state of a familiar private practice among banks did not constitute state action. The state had to offer instrumental assistance besides a passive acceptance to encourage or create the illegal action *id.,* at 930. Cf. *Pavolini v. Bard-Air Corp.,* 645 F.2d 144, 147 (2nd Cir. 1981). (The FAA's approval of regulations did not constitute state action against pilot discharged because he informed the FAA of a condition in defendant's airplane that violated these regulations.) In this case, which is not a valid discrimination claim, much less one of racial discrimination,[15] the action of the state in issuing the permit plans and amendments does not constitute sufficient involvement of the state. The permit neither compels nor orders and grants no enforceable rights upon the property. All allegations claiming that Housing, Overseas and Chase acted under color of law, and, therefore, with the weight of the action of the state because of the issuance of the permit, are insufficient to constitute state action. See generally: *Rendell-Baker v. Kohn,* —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

Compliance with the requirement of state action would be present if plaintiffs' allegations were sufficient to connect the state with the private defendants in a conspiracy to deprive them of a constitutional right. Although we must proceed with caution when determining within the context of a summary judgment whether the allegations and documents in support are sufficient to present the framework for a conspiracy, unless some factual basis is pled mere conclusory allegations will not suffice. *Francis-Sobel v. Univ. of Maine,* 597 F.2d 15, 17 (1st Cir. 1979), *cert. denied,* 444 U.S. 949, 100 S.Ct. 419, 62 L.Ed.2d 318; *Slotnick v. Staviskey,* 560 F.2d 31 (1st Cir. 1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55

**15.** In *Fletcher, ante,* at p. 931 our Circuit suggested that the requirements for state action may be more lax in equal protection cases and citing Judge Friendly stated:

[R]acial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts ... *Coleman v. Wagner College,* 429 F.2d 1120, 1127 (2nd Cir. 1970) (concurring opinion).
See also: *Spirt v. Tchrs. Ins. & Annuity Ass'n,* 475 F.Supp. 1298, 1312 (SDNY 1979).

L.Ed.2d 783 (1978); *Moran v. Bench,* 353 F.2d 193 (1st Cir. 1965), *cert. denied,* 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1965). In *Safeguard Mut. Ins. Co. v. Miller,* 477 F.Supp. 299 (E.D.Pa.1979) the Pennsylvania District Court stated: "There must be factual allegations that the defendants plotted or planned or conspired together to carry out the chain of events." *Id.,* at 304. In the instant case plaintiffs' allegations fail to establish this thread of continuity between the concerted actions of the conspirators. The interrelationship of these separate actions occurring at different times and between different persons has not been properly shown. We have examined the allegedly fraudulent judicial foreclosure between Constructora and Housing and find that there is nothing in this lawsuit even resembling conspiratorial activity related to plaintiffs' claim. It is not the conspiratorial acts *per se* that give rise to liability but rather the damage cause. *Hostrop v. Bd. of Junior College Dist. No. 515,* 523 F.2d 569, 576 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1975). The relationship with the planning agencies only demonstrates that Constructora and Capacete were the entities that obtained the permit in 1975. The presence or participation of Housing, Overseas or Chase has not been alleged except in a conclusory manner and plaintiffs have not come forward with documentary evidence in opposition to defendants' sworn statements of noninvolvement with the state. *First Nat. Bank of Arizona v. Cities Service,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Mas Marques v. Digital Equipment Corp.,* 637 F.2d 24 (1st Cir. 1980). Plaintiffs have not alleged that Constructora or Capacete trespassed on their

property upon the authority of the permit and neither is there evidence on record to that effect. The action which motivated plaintiffs to institute the array of judicial proceedings in the federal as well as the state courts was Housing's [16] alleged trespass in January 1978. Aside from conclusory statements, plaintiffs have not alleged nor presented documentary evidence or other proof to connect the defendants in a related scheme of conspiracy. Despite having had almost four years of discovery plus the unique advantage of having other related cases in the local courts on which they could also conduct discovery, and despite having taken numerous depositions and submitted interrogatories, documents and correspondence, plaintiffs have not been able to provide the necessary information connecting defendants during the span of time corresponding to the only alleged acts—basically the 1974 consent letter, the 1975 permit, the 1977 mortgage foreclosures and the 1978 trespass. Although in the context of a summary judgment analysis plaintiffs are entitled to all favorable inferences, they cannot build "a conspiracy on opprobrious epithets of malice" or "gossamer threads of whimsy, speculation and conjecture" *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, at 830 (1st Cir. 1982) citing *Snowden v. Hughes,* 321 U.S. 1, 10, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1964); *White v. The Hearst Corp.,* 669 F.2d 14, 19 (1st Cir. 1982), and *Manganaro v. Delaval Separator Co.,* 309 F.2d 389, 393 (1st Cir. 1962). Nor does the mere fact that plaintiffs' claim contains elements of state of mind entitle them to a trial. *Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir. 1975). We find that plaintiffs' "conspiracy" action involving defend-

---

**16.** It should be noted that Housing's conduct after plaintiffs erected the fence hardly appears to be one of a conspirator. Housing's attorneys notified plaintiffs that they believed that Mrs. Isabel Romeu's consent entitled them to use the access. After no accord was reached they turned to the courts. If a conspiracy with the planning agencies had existed, Housing would have probably turned to the power of these agencies to issue temporary orders, P.R. Laws Ann. Tit. 23 Sec. 71x, instead of to the courts. There is debate on whether Mrs. Romeu's act was one of administration or transfer of property rights. The latter would have required judicial authorization. We need not solve this issue of state law but merely point out that it is not unreasonable to have considered the consent as sufficient. A lack of bad faith disregard for clearly established constitutional rights will not hold defendants liable for damages. See *Rogers v. Okin,* 634 F.2d 650 (1st Cir. 1980) vacated on other grounds *Mills v. Rogers,* —— U.S. ——, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

ants Housing, Overseas, Chase, the Planning Board, ARPE and its officers, Luis A. San Miguel, Constructora and its officials, Capacete and its officials, CALP and Libby's is a mere compilation of conclusory allegations which, standing alone or incessantly repeated, do not establish the necessary elements to spell out a Section 1983 conspiracy.

In sum, even if the actions that Housing-Overseas allegedly committed, although not a taking, constituted interference with a property or a restriction of a liberty interest (see: *Board of Regents v. Roth, ante*) and even if plaintiffs' conjectural and flimsy allegations of conspiracy established the necessary state action or involvement of the private defendants with the planning agencies, these actions only amount to a tort claim or an action in trespass. The alleged constitutional violation that must be then examined is whether the procedures provided by the state do not guarantee that plaintiffs will receive adequate remedies for their injuries. See *Martinez v. California,* 444 U.S. 277 at 284 n. 9, 100 S.Ct. 553 at 558 n. 9, 62 L.Ed.2d 481 (1980).

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) the Court held that a tortious loss of property caused by the state was not a violation of the Fourteenth Amendment if the state provided a procedure that could redress the injury adequately,[17] for the important constitutionally protected interest is not property but rather due process, *id.,* at 537, 101 S.Ct. at 1913, see also: *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). As demonstrated by the many cases plaintiffs have filed in the courts of Puerto Rico and by the injunction they have obtained preventing Housing's interference with their property, they not only have available but have used adequate procedural safeguards that the laws of Puerto Rico provide to redress the alleged injury. They also have an extensive administrative scheme that provides sufficient procedural safeguards. See: P.R. Laws Ann. Tit. 23 Sec. 62v (Citizen participation in planning); Sec. 62z (public hearings), 63c (notice, access to public of agency's decisions), 63d (judicial review), 71g (requirement of bonds), 71v (penalties), 72 (recourse in name of the people), 72b (Board of Appeals with judicial review) which has not been alleged to have been misused maliciously to deprive them of due process. See: *Logan v. Zimmerman Brush Co.,* —— U.S. ——, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

It is important to note that in *Creative Environments, Inc., ante,* the Court in its analysis of the due process claim considered that the local procedural safeguards afforded were sufficient to guarantee due process, at note 9, 120 *id.* it mentions:

[W]here . . . the state has erected a complex statutory scheme and provides for avenues of appeal to the state courts, property is not denied without due process simply because a local planning board rejects a proposed development for erroneous reasons or makes demands which arguably exceed its authority under relevant statutes.

It would be hasty, premature and inconsistent with *Parratt v. Taylor, ante,* for this Court to hold that plaintiffs' ongoing judicial remedies and appeals and the procedural remedies afforded by the Courts of Puerto Rico are insufficient due process guarantees to protect them from a simple tortious interference with their land. Plaintiffs' allegations, whether in the original complaint or in the amended version, fail to set forth a fully developed configuration of a constitutional due process claim. For these reasons, that part of the complaint that refers to a conspiracy during 1974–1978 between the Planning Board, ARPE and the named officers, Housing, Overseas and Chase, CALP, Libby's, Mr. San Miguel, Constructora, Capacete and their affiliates and officers or employees must be dismissed.

---

**17.** In the present case, as in *Parratt,* the only injury involved is to property and the only violation at stake is a generalized due process claim under the Fourteenth Amendment. There may be circumstances that affect other constitutional rights and liberty interests and may require a different approach. See *Parratt v. Taylor, ante,* J. Powell & Blackmun concurring opinion.

Plaintiffs' bare allegation in the amended complaint that the Planning Board by declassifying their property as public (P) for a future construction of a navigable canal, aside from the fact that they have not excused their delay in pointing this fact to the Court (the property was classified as such in 1975), is insufficient to give life to their claim for there is no relationship between this and the allegations of conspiracy. Although it may be correct to assume that the channel will not be built in the near future (deposition of Adalberto Colón), the channel will pass through other properties and is unrelated to the access path in dispute. In fact, the path of this proposed channel covers most of plaintiffs' land and will probably require condemnation of most of it. To permit the joinder of this separate cause of action will serve only to complicate this case beyond comprehension. Plaintiffs may file, if they so wish, an action for inverse condemnation properly pleaded and in light of recent decisions on zoning. See: *Agins v. City of Tiburón, ante* and *Hotel Coamo Springs, Inc. v. Colón,* 539 F.Supp. 1008, 1018 (D.P.R.1982).

The only allegations that need further analysis are those in the amended complaint related to the alleged unconstitutional conspiracy by Housing, Overseas and Chase with PRASA to condemn the access road in plaintiffs' land.[18] A conspiracy could possibly be extracted, although with great difficulty, from plaintiffs' amended allegations regarding PRASA. It could well be inferred that after Housing was stopped from using the access road by the local court's injunction and it realized that it had no enforceable real property right against plaintiffs' land [19] as a last and only resort it urged PRASA to initiate proceed-

ings to condemn the access road. Both entities would benefit from this condemnation since Housing would have the much sought temporary access to its warehouse converted into a public road and plaintiffs' allegations and documentation in support (correspondence between Housing, Overseas and Chase officials) have at least established doubt on whether PRASA would benefit from the dealings since apparently Housing would offer construction services at lower costs as part of the expropriation ·cost. The criteria called for in a summary judgment analysis. See: *Adickes v. S.H. Kress & Co., ante,* would suggest that this part of plaintiffs' claim in the amended complaint (conspiracy between Housing and PRASA) may have contained a valid cause of action with material facts shrouded in controversies that would defeat a summary dismissal. Yet we cannot ignore the reality of the other local judicial proceedings related to this case. The expropriation case filed against plaintiffs and defendant Isabel Romeu by the Commonwealth of Puerto Rico was adjudicated adversely to plaintiffs herewith. We must examine if plaintiffs' claim against PRASA has already been adjudicated by the expropriation proceeding.

In *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Supreme Court observed that federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. The Court held that since a state court's criminal proceeding had given the parties a full and fair opportunity to litigate the federal claims, petitioners in the civil rights actions were collaterally estopped from relitigating the search and seizure question already decided against them in the state court. Even though respondent

---

**18.** Although in its sweeping conclusory style the amended complaint also includes the other defendants in this conspiracy, we find no allegations of specific acts of these defendants from which we would infer their participation in this "second leg" of the conspiracy. As mentioned before, mere conclusory statements are insufficient to frame a cause of action for conspiracy. See cases before cited.

**19.** This theory would support the lack of any sign of concerted actions in the events prior to January 1978 for if defendants were acting in conspiracy with the planning agencies they would have asked their conspirator friends at the Planning Board to take steps to either issue a temporary administrative order against plaintiffs (P.R. Laws Ann. Tit. 23 Sec. 71x) or transfer the alleged easement to a public deed, record it in the Registry of Property and then, request judicial enforcement.

could not seek a writ of habeas corpus in a federal court, the Supreme Court concluded that 42 U.S.C. Sec. 1983 did not repeal or restrict the traditional doctrines of preclusion from a fact adjudicated by a state court "when the state court acting within its proper jurisdiction has given the parties a full and fair opportunity to litigate federal claims and thereby has shown itself willing and able to protect federal rights." *Id.,* at 103–104, 101 S.Ct. at 420. In addition to recognizing the traditional interests of res judicata and collateral estoppel, such as to avoid the costs and vexations of multiple suits, to conserve judicial resources, and to prevent inconsistent decisions, the Court noted that these doctrines also promote comity between state and federal courts. Regarding the basic requirement for the application of collateral estoppel to preclude an already litigated issue, the Court mentions:

> "[T]he concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." (Citations omitted) *Id.,* at 95, 101 S.Ct. at 415.

And in *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) the Court emphasized the importance of the principles embodied in the doctrine of res judicata and the need for courts to recognize the pre-eminence of these considerations of public policy. See also *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

In the present case, the Puerto Rico Highway Authority (PRASA), through the Commonwealth of Puerto Rico, instituted condemnation proceedings against the Fuertes Romeu heirs and defendant Isabel Romeu (Fuertes Romeu) before the Superior Court of Puerto Rico in case E–78–228–229. The land to be condemned included an access road that passed through plaintiffs' land and would provide access to the PRASA water treatment plant being constructed and the warehouse distribution center belonging to defendants Housing and Overseas. Plaintiffs herewith, whose lawyer in that action was also Mr. Costas Elena, answered the petition for condemnation and filed a counterclaim against PRASA. The Superior Court as stated in its Resolution and Narrative Statement of the Evidence of August 1, 1981 received the testimony presented by PRASA [20] (the Fuertes Romeu limited their evidence to cross-examination of PRASA's witness) and concluded that there was a public purpose in the taking of the Fuertes Romeu property and left for a future determination if the $9,700.00 deposited in court by PRASA was adequate compensation. The Fuertes Romeu then filed a writ of appeal to the Supreme Court of Puerto Rico alleging basically the same averments of the present action. The appeal was dismissed because it had not raised a substantial constitutional question. On January 27, 1981 the Supreme Court issued a writ of review and by Judgment of March 9, 1982 affirmed the lower court's holding. The Supreme Court determined that the need to acquire Parcel A was evident from the testimony of PRASA's engineers and concluded that the construction of the access road was for a public purpose.[21] The

---

**20.** The Court in summarizing PRASA's testimony mentioned:

> On the photograph he shows the place of the treatment plant; the area of the North Distribution Center; the lot on A Street running from East to West, and Las Palmas Avenue, running from North to South. As a result of the project, A Street must be closed: then the warehouses reached by it would be landlocked, and also three other lots and two potential lots. The amendment serves the purpose of providing an access to the North Distribution Center through Road 869, placing them in the same position they were

before the closing of A Street. The cost to the state if the damages caused by the closing of the access to A Street were not cured would be millions of dollars.

**21.** The Court mentions at page 2:

> Parcel 9A was evidently taken as part of a global plan for the construction of a water treatment plant to serve the community. The existing access had to be closed for safety reasons. There is a justified public necessity to provide said community with an adequate means of communication. The state is empowered to provide an access to said community if it determines that it is for the gen-

Court considered the allegations that the access road had nothing to do with the purposes of PRASA to be without merit. A Motion for Reconsideration of this Judgment was denied on April 7, 1982.

The principles of res judicata, comity and respect for a healthy relationship between the federal and state courts as signaled by the Supreme Court in *Allen v. McCurry, ante,* lead us to conclude that plaintiff's new claim of due process regarding PRASA has already been ruled upon by competent and able courts. This final judgment should not be disturbed save for some overwhelming and compelling reason which has not been shown to this Court.[22] Plaintiff has had more than a "full and fair opportunity" to present his claim. We would do no service to justice if the issues already adjudicated by the highest court of Puerto Rico were reopened and relitigated.

In short, plaintiffs have by their complaint and belated amended complaint tried to obtain an additional forum to voice their claim by joining with the magical phrase of "conspired with" a series of unrelated acts that may be solved independently by the local proceedings, some of which are still pending due to a voluntary deference to this Court. Plaintiffs' complaint and constant supplementary memoranda, although citing many authorities on the *general* constitutional doctrine of due process, totally ignores the factual reality of their case. Rather than a lack of process what the record reveals is an abuse of process by plaintiffs of all the judicial resources that they have utilized to voice their simple trespass claim aptly camouflaged in their gallimaufry of conclusory argumentation.

For the reasons stated plaintiffs' entire action is hereby DISMISSED. Judgment shall be entered in accordance with this opinion.

SO ORDERED.

eral welfare regardless of the fact that there may be another access and that certain persons or entities may benefit from the new one.

22. On the contrary plaintiffs did not cooperate with this Court by providing information on the

expropriation proceedings. This conduct is highly reproachable for a lawyer who is also an officer of the Court. This is the second time (that we know of) that Mr. Costas Elena indulges in such questionable conduct, see n. 4.